# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 5786 | **DATE** | 12/11/2002 |
| **CASE TITLE** | Ashland Products, Inc. vs. Truth Hardware Corporation- | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Plaintiff's motion for summary judgment is granted on the issue of patent invalidity and denied on the issue of inequitable conduct. Truth's motion for summary judgment on the issue of patent infringement is denied as moot. Enter memorandum opinion and order.

(11) ■ [For further detail see order attached to the original minute order.]

| ✓ | No notices required, advised in open court. | | | | **Document Number** |
|---|---|---|---|---|---|
| | No notices required. | | number of notices | | |
| | Notices mailed by judge's staff. | | DEC 1 2 2002 | | |
| | Notified counsel by telephone. | | date docketed | | 133 |
| | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | date mailed notice | | |
| SLB | courtroom deputy's initials | | | | |

U.S. DISTRICT COURT
CLERK
02 DEC 11 PM 5: 17
FILED

Date/time received in central Clerk's Office | mailing deputy initials

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ASHLAND PRODUCTS, INC.,     )
    )
  Plaintiff/Counter-Defendant,   )
    )     **Case No. 99 C 5786**
  v.     )
    )     **Hon. John W. Darrah**
TRUTH HARDWARE CORPORATION,)
    )
  Defendant/Counter-Plaintiff.   )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Ashland Products, Inc. ("Ashland"), filed a two-count complaint against Defendant, Truth Hardware Corporation ("Truth"), seeking a declaratory judgment that Ashland has not infringed Truth's Patent No. 5,765,308 ("the '308 patent") and that the '308 patent is invalid and unenforceable. The '308 patent makes eight claims (two independent claims, each having three dependent claims) directed to a window operator used in combination with a window frame. Truth subsequently filed a counterclaim for infringement and injunctive relief.

After a *Markman* hearing was held and briefs were submitted, the Court construed the disputed terms in the '308 patent in a Memorandum Opinion and Order dated May 29, 2002. Ashland now moves, pursuant to Federal Rule of Civil Procedure 56, for summary judgment of invalidity and unenforceability of the '308 patent. Truth, pursuant to Rule 56, also moves for summary judgment of infringement on its counterclaim. For the reasons that follow, Ashland's Motion for Summary Judgment is granted on the basis of invalidity and denied on the basis of inequitable conduct. Truth's Motion for Summary Judgment is denied as moot.

-1-

## LEGAL STANDARD

Summary judgment is appropriate when there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.*, 40 F.3d 146, 150 (7th Cir. 1994). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Thus, although the moving party on a motion for summary judgment is responsible for demonstrating to the court why there is no genuine issue of material fact, the non-moving party must go beyond the face of the pleadings, affidavits, depositions, answers to interrogatories, and admissions on file to demonstrate, through specific evidence, that there remains a genuine issue of material fact and show that a rational jury could return a verdict in the non-moving party's favor. *Celotex*, 477 U.S. at 322-27; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254-56 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir. 1994).

Disputed facts are material when they might affect the outcome of the suit. *First Ind. Bank v. Baker*, 957 F.2d 506, 507-08 (7th Cir. 1992). When reviewing a motion for summary judgment, a court must view all inferences to be drawn from the facts in the light most favorable to the opposing party. *Anderson*, 477 U.S. at 247-48; *Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726, 731 (7th Cir. 1999). However, a metaphysical doubt will not suffice. *Matsushita*, 475 U.S. at 586. If the evidence is merely colorable or is not significantly probative or is no more than a scintilla, summary judgment may be granted. *Anderson*, 477 U.S. at 249-250.

Ashland moves for summary judgment on the grounds of invalidity, *i.e.* the '308 patent was (1) anticipated or (2) obvious. A patent is presumed valid. 35 U.S.C. § 282 (2002). A party

challenging the validity of a patent must overcome the presumption of validity by clear and convincing evidence. *Helifix Ltd. v. Blok-Lok, Ltd.*, 208 F.3d 1339, 1346 (Fed. Cir. 2000). "[T]he offering party is more likely to carry the burden of persuasion imposed by 35 U.S.C. § 282 when art *more* pertinent than that considered is introduced." *Medtronic, Inc. v. Cardiac Pacemakers, Inc.*, 721 F.2d 1563, 1566 (Fed. Cir. 1983). A patent is invalid if the claimed invention is "anticipated" or "obvious" in light of the prior art. *See* 35 U.S.C. §§ 102, 103 (2002). "Although anticipation is a question of fact, it may still be decided on summary judgment if the record reveals no genuine dispute of material fact. . . . Summary judgment is proper if no reasonable jury could find that the patent is not anticipated." *Telemac Cellular Corp. v. Topp Telecom., Inc.*, 247 F.3d 1316, 1327 (Fed. Cir. 2001) (internal citations omitted). Summary judgment on the issue of obviousness is appropriate "only when the underlying factual inquiries present no lingering genuine issues." *Beckson Marine, Inc. v. NFM, Inc.*, 292 F.3d 718, 723 (Fed. Cir. 2002).

## BACKGROUND

The undisputed facts taken from the parties' Local Rule 56.1(a) & (b) statements of material facts (referred to herein as "Pl.'s 56.1" and "Def.'s 56.1"[1]) and exhibits are as follows.

Ashland is a Delaware corporation with its principal place of business in Illinois. (Pl.'s 56.1 ¶ 1.) Truth is a Delaware corporation with its principal place of business in Minnesota, registered to do business in Illinois. (Pl.'s 56.1 ¶ 2.) Truth and Ashland are competing manufacturers and

---

[1]The Court will not consider unsupported statements of fact or general "denials" that do not contain references to the factual record, as required by Local Rule 56.1(3). *See Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000) (strict compliance with the local rules governing summary judgment is upheld given the importance of local rules that structure the summary judgment process). It is deemed as admitted all 56.1 responses which fall into this category.

sellers of window hardware products, including window operators, a mechanical device for opening and closing a window sash within the frame. (Def.'s 56.1 ¶ 1.)

Truth is the assignee of the '308 patent. (Def.'s 56.1 ¶ 9; Pl.'s 56.1 ¶ 5.) The '308 patent application was filed on December 19, 1995. (Pl.'s 56.1 ¶ 6.) The '308 patent names as inventors former Truth employees, Todd A. Anderson ("Anderson") and Daniel G. Tucker ("Tucker"), and current Truth employees, James G. Seaser ("Seaser") and Douglas G. Johnson ("Johnson"). (Pl.'s 56.1 ¶ 7.)

<em>The '308 Patent</em>

The original '308 patent application contained thirty-one claims. (Pl.'s 56.1 ¶ 9.) Claims 24 through 31 were later renumbered and issued as Claims 1 through 8 of the '308 patent. (Pl.'s 56.1 ¶ 10.) Truth cancelled the other twenty-three claims during prosecution of the '308 patent. (Pl.'s 56.1 ¶ 11.) The issued claims of the '308 patent are directed to combination of a window operator having a "slot" and a window frame having a "raised portion". (Pl.'s 56.1 ¶ 12.)

Only two of the '308 patent's claims are "independent claims"; the remaining six claims are "dependent claims". (Pl.'s 56.1 ¶ 13.) Independent Claim 1 claims:

An operator and window frame or a window having a sash movable relative to said frame between open and closed positions, said combination comprising:

A window frame with a raised surface portion protruding therefrom;

A base having an interior support surface with a slot therein, said base attached to said frame with said raised surface fitting substantially within the slot.

An arm pivotally secured to said base and attachable to a sash to control the movement of a sash between open and closed positions; and

A worm disposed within the interior support surface and driveably engaging said arm.

(Pl.'s 56.1 ¶ 14.) Dependent Claim 2 limits the slot in the base of Claim 1 to one having "a rectangular cross-section". (Pl.'s 56.1 ¶ 15.) Dependent Claim 3 requires that the operator of Claim 1 have a cover, which combines with the base to define a "sealing surface". (Pl.'s 56.1 ¶ 16.) Dependent Claim 4 claims the operator/frame combination of Claim 3 "further comprising a gasket fitted around the sealing surface". (Pl.'s 56.1 ¶ 17.)

Independent Claim 5 of the '308 patent requires:

An operator and window frame for a window having a sash movable relative to said frame between open and closed positions, said combination comprising:

A window frame with a raised surface protruding therefrom;

A base having a first support surface and a bottom exterior surface with a slot therein, said base attached to said frame with said raised surface fitting substantially within the slot;

A cover secured to said base and having a second support surface with a hole therethrough defining an internal shoulder, the second support surface mating with the first support surface;

An arm pivotally secured to said base and attachable to a sash to control the movement of a sash between open and closed positions; and

A worm driveably engaging said arm and having a worm shaft and a worm shoulder disposed on the worm shaft, said worm directly supported by the first and second surfaces at one end and the worm shoulder engaging the internal shoulder with the worm shaft protruding from the hole.

(Pl.'s 56.1 ¶ 18.) Dependent Claim 6 limits the slot in the base of Claim 5 to one having "a rectangular cross-section". (Pl.'s 56.1 ¶ 19.) Dependent Claim 7 requires that the cover and base of the operator in Claim 5 combine at the rear to define a "sealing surface". (Pl.'s 56.1 ¶ 20.) Dependent Claim 8 claims the operator/frame combination of Claim 7 "further comprising a gasket

fitted around the sealing surface". (Pl.'s 56.1 ¶ 21.)

In the '308 patent specification, the Applicants represented that then-existing window operators "typically [had] a mounting base with a flat planar bottom secured to a corresponding flat planar surface on a sill of the frame." (Pl.'s 56.1 ¶ 22.) The specification also states that the "typical" flat planar base/flat planar sill interface was undesirable because it permitted air and/or water to infiltrate into the home. (Pl.'s 56.1 ¶ 23.) The slot/raised surface interface of the "invention" proposed in the '308 patent claims purportedly solved this problem by eliminating the "flat planar surface" and permitting the retention of a "wall" on the window frame to block air and water. (Pl.'s 56.1 ¶ 24.) The claimed operator/frame combination's "utility" was keyed predominantly to the fact that the operator can be secured to a window frame having a "raised surface" or "wall" rather than a "flat planar surface". (Pl.'s 56.1 ¶ 25.)

The original patent application for the '308 patent, filed on December 19, 1995, disclosed five prior art references: U.S. Patent Nos. 4,253,279, 4,266,371, 4,445,794, 4,505,601, and 4,845,830, which were all assigned to Truth. (Pl.'s 56.1 ¶¶ 26, 27.) These five patents show only window operators having a "flat planar bottom". (Pl.'s 56.1 ¶ 28.) In procuring the '308 patent, the Truth inventors identified only one competitor's window operator product to the United States Patent and Trademark Office ("PTO")–an Arthur Shaw operator, which was disclosed to the PTO on February 26, 1996. (Pl.'s 56.1 ¶ 29.)

In the May 29, 2002 Opinion and Order, this Court construed the term "base" to mean "the bottom support of the operator; the piece (or multiple pieces) that support the remainder of the operator and/or permit the operator to be mounted to a window frame." (Pl.'s 56.1 ¶ 43.) In that Order, the term "slot" was construed to mean "a groove or opening in the bottom exterior surface

of a window operator's bottom support that accommodates a raised surface of a window frame". (Pl.'s 56.1 ¶ 44.)

Truth began to design the casement window operator that eventually was claimed in the '308 patent in February 1993 ("the '308 project"). (Pl.'s 56.1 ¶ 46.) Greg Jefferson ("Jefferson"), Truth's former Product Manager for casement window hardware, initially led the '308 project. (Pl.'s 56.1 ¶ 47.) Tucker, a Truth engineer until his death in 1994, worked with Jefferson on the '308 project. (Pl.'s 56.1 ¶ 48.) One of the goals of the '308 project was to lower manufacturing costs. (Pl.'s 56.1 ¶ 49.) Another goal of the '308 project was to design an operator that reduced air and water infiltration into the home at the operator/window frame interface. (Pl.'s 56.1 ¶ 54.) The new operator was intended to replace Truth's single-arm and dual-arm operators. (Pl.'s 56.1 ¶ 50.)

*The Prior Art in 1995*

Roto Frank Hardware ("Roto Frank") was one of Truth's competitors at the time of the '308 project. (Pl.'s 56.1 ¶ 55.) The slot in the Roto Frank operator was created by placing a plastic piece (also known as a "spacer") under the exterior portion of the operator, such that a space remained between the spacer and the wall of the operator housing. (Pl.'s 56.1 ¶ 59.) Certain window manufacturers actually used the Roto Frank/Weitman Operator (manufactured by Wilhelm Weitman, Inc.) to accommodate the raised portion of the window frame. (Pl.'s 56.1 ¶ 64.) In order to eliminate the spacer used with the Roto Frank/Weitman Operator base, Truth incorporated a "slot" or "channel" into a one-piece base. (Pl.'s 56.1 ¶ 67.) Anderson testified that he believed either he or Tucker added the "slot" to Truth's operator's design. (Pl.'s 56.1 ¶ 68.) The Roto Frank/Weitman Operator also featured a separate cover and base. (Pl.'s 56.1 ¶ 70.) The Truth Operator also has a cover and a base. (Pl.'s 56.1 ¶ 71.)

Johnson and Anderson used data that Truth had gathered from customers regarding dimensions of the "raised surfaces" to determine the appropriate dimensions for the operator's slot feature. (Pl.'s 56.1 ¶ 73.) In May 1996, Truth introduced the "Sealable Single Arm and Split Arm Operator, Item Class NK and NL" ("sealable operator"). (Pl.'s 56.1 Ex. 17, at 001959.) As of May 1997, sales of the "sealable" operator had been less than expected. (Pl.'s 56.1 ¶ 74.)

Truth has obtained, when possible, samples of competitive window operator products and tested them. (Pl.'s 56.1 ¶ 76.) Samples of competitors' operators are kept in a drawer in the Product Manager's office at Truth. (Pl.'s 56.1 ¶ 77.) Samples were available for Truth employees to examine. (Pl.'s 56.1 ¶ 79.) Johnson was familiar with the samples kept in the drawer. (Pl.'s 56.1 ¶ 80.) Johnson and Brian Dallman ("Dallman"), Truth's Product Manager, retrieved samples of certain operators and produced them to William Smith ("Smith"), who had been retained by Truth as an expert. (Pl.'s 56.1 ¶ 81.)

Truth also gathered information about its competitors and their products through its sales personnel. (Pl.'s 56.1 ¶ 82.) Truth's sales personnel communicated information about competitors' products to Truth's engineers and managers through sales reports. (Pl.'s 56.1 ¶ 83.) Truth's sales personnel would also visit window manufacturers who did not use Truth's products in an effort to convert them to Truth's products. (Pl.'s 56.1 ¶ 84.) Throughout the 1990's, Truth sent its personnel to window industry trade shows to display its own products and to view the competition. (Pl.'s 56.1 ¶¶ 86, 87.) Truth sent personnel to trade shows during the '308 project. (Pl.'s 56.1 ¶ 89.) Roto Frank and other Truth competitors routinely displayed their products, including their casement window hardware, at trade shows throughout the 1990's, including during the '308 Project. (Pl.'s 56.1 ¶ 272.)

The Roto Frank/Weitman Operator was distributed by Roto Frank from at least 1991 through 1996. (Pl.'s 56.1 ¶ 90.) Roto Frank, Mila, Wright Products, GU, and Amerock were Truth's major competitors at that time. (Pl.'s 56.1 Ex. 19, at 15-16.) Truth had acquired and tested Roto Frank's products. (Pl.'s 56.1 ¶ 92.)

The Roto Frank/Weitman Operator has a mounting surface, comprised of two metal pieces and one plastic piece or "spacer", having an inverted U-shape opening. (Pl.'s 56.1 ¶ 93.) The inverted U-shape opening in the Roto Frank/Weitman Operator has a generally rectangular cross-section. (Pl.'s 56.1 ¶ 94.) The inverted U-shape opening permits the Roto Frank/Weitman Operator to be secured to a window frame having a raised portion. (Pl.'s 56.1 ¶ 95.) The Roto Frank/Weitman Operator is made for use on a casement window with a sash and frame. (Pl.'s 56.1 ¶ 96.) The opening can be seen in a properly assembled Roto Frank/Weitman Operator containing a spacer. (Pl.'s 56.1 ¶ 108.)

The Roto Frank/Weitman Operator has a base that supports the remainder of the operator. (Pl.'s 56.1 ¶ 98.) However, the Roto Frank/Weitman Operator does not have a mounting base with a flat planar bottom. (Pl.'s 56.1 ¶ 105.)

The worm of the Roto Frank/Weitman Operator protrudes from a hole in the plastic cover of the operator. (Pl.'s 56.1 ¶ 101.) The worm of the Roto Frank/Weitman Operator has a worm shaft and a shoulder on the worm shaft. (Pl.'s 56.1 ¶ 102.) The worm is supported at one end by the interior housing. (Pl.'s 56.1 ¶ 103.)

The Roto Frank/Weitman Operator has a plastic cover. (Pl.'s 56.1 ¶ 97.) The cover and the interior housing base of the operator combine to form a sealing surface that could be enhanced by the use of a gasket. (Pl.'s 56.1 ¶ 104.)

One or more of the Truth Inventors may have been aware of the Roto Frank/Weitman Operator on or before the '308 patent's filing date of December 19, 1995, and the '308 patent's issuance. (Pl.'s 56.1 ¶¶ 109, 110.) Truth's retained expert witness, Smith, testified that the only functional difference between the Roto Frank/Weitman Operator and Truth's "sealable" operator is that the former operator's base is composed of multiple pieces while the latter operator's base is composed of one piece. (Pl.'s 56.1 ¶ 111.) The Roto Frank/Weitman Operator and the 1991 Roto Frank brochure were not cited to the examiner. (Pl.'s 56.1 ¶¶ 220, 222.) The examiner did not consider them when examining the '308 patent application. (Pl.'s 56.1 ¶¶ 221, 223.)

Interlock Industries, Ltd. ("Interlock") described a window operator in International Patent WO 95/18284, which was published on July 6, 1995. (Pl.'s 56.1 ¶¶ 114, 115.) An United States patent, Patent No. 5,937,582 ("'582 Interlock patent"), assigned to Interlock describes a window operator. (Pl.'s 56.1 ¶ 116.) Two copies of the '582 Interlock patent were produced in this litigation from Truth's files. (Pl.'s 56.1 ¶ 117.) The Roto Frank/Interlock Operator appears to be "generally the same" as the operator depicted in the '582 Interlock patent and the International Patent WO 95/18284. (Pl.'s 56.1 ¶ 118.) The Roto Frank/Interlock Operator is made for use on a casement window with a sash and frame. (Pl.'s 56.1 ¶ 119.) The lower metal housing of the Roto Frank/Interlock Operator combines with a "packer", *i.e.*, a plastic piece, that fits under the mounting surface to form a base that supports the remainder of the operator. (Pl.'s 56.1 ¶ 122.) The opening in the base of the Roto Frank/Interlock Operator accommodates a raised surface of a window frame. (Pl.'s 56.1 ¶ 124.) The Roto Frank/Interlock Operator could be installed with the packer to a window frame with a raised surface in order to prevent air and water from getting into the home. (Pl.'s 56.1 ¶ 126.) It was the custom in the industry to use a gasket to enhance the sealing surface

-10-

formed by the cover and the base of a window operator. (Pl.'s 56.1 ¶ 136.) The Roto Frank/Interlock Operator was not cited to the examiner and, thus, was not considered during the examination of the '308 patent application. (Pl.'s 56.1 ¶¶ 224, 225.)

The Interlock PCT patent and the '582 Interlock patent describe an operator ("the Interlock Patent Operator") made for use on a casement window with a sash and frame. (Pl.'s 56.1 ¶ 137.) The Interlock Patent Operator has a two-piece housing. (Pl.'s 56.1 ¶ 138.) The housing of the Interlock Patent Operator is formed by a cover and a base. (Pl.'s 56.1 Ex. 37 at 30 ll. 28-29.) A mounting frame projects from one side edge of the housing. (Pl.'s 56.1 ¶ 139.) The lower metal housing of the Interlock Patent Operator combines with a packer that fits under the mounting frame to form a base that supports the remainder of the operator. (Pl.'s 56.1 ¶ 140.)

The proper placement of the packer beneath the mounting frame of the Interlock Patent Operator creates a gap between the packer and the lower metal housing. (Pl.'s 56.1 ¶ 141.) The gap in the base of the Interlock Patent Operator accommodates a raised surface of a window frame. (Pl.'s 56.1 ¶ 142.) When the Interlock Patent Operator is installed with a packer to a window frame with a raised surface, the gap formed between the packer and the raised surface provides "a clear channel should any water or moisture get in behind the packer". (Pl.'s 56.1 ¶ 144; Pl.'s 56.1 Ex. 37 at 9 ll. 13-14.)

The Interlock Patent Operator has an arm pivotally secured to the operator's base that is attachable to the window sash for controlling movement of the sash. (Pl.'s 56.1 ¶ 147.) The Interlock Patent Operator has a "drive gear", *i.e.*, a worm gear, disposed within the interior of the cover that "meshes" with the gear wheel on the link arm. (Pl.'s 56.1 ¶ 148.)

One or more of the Truth Inventors was aware of the Roto Frank/Interlock Operator on or

before December 19, 1995, the filing date of the '308 patent, and June 16, 1998, the date the '308 patent was issued. (Pl.'s 56.1 ¶¶ 153, 154.) The Interlock PCT patent and the '582 Interlock patent were not cited to the examiner. (Pl.'s 56.1 ¶¶ 226, 228.) The examiner did not consider them when examining the '308 patent application. (Pl.'s 56.1 ¶¶ 227, 229.)

Smith, the expert retained by Truth, testified that a functional difference between the Roto Frank/Interlock Operator and Truth's "sealable" operator is that the Roto Frank/Interlock Operator's base is composed of multiple pieces, while the Truth base is composed of one piece. (Pl.'s 56.1 ¶ 155.) Smith testified that, in order to solve the air and water infiltration problem, he "would want to develop some type of attachment device or base that would allow [him] to still maintain that raised portion of the window frame, not to interfere with that raised portion of the frame[,] while still being able to securely mount the device to the frame and do it in a such way" that seams or joints through which water or air may pass are not created. (Pl.'s 56.1 Ex. 9 at 87:23-88:5.) Smith also testified that the air and water infiltration problem could be solved by making the "shim," another term for packer, and base "integral" with each other or "the raised portion of the base that is outward of the recess to be integral with the base." (Pl.'s 56.1 Ex. 9 at 88:11-14.)

Before December 19, 1995, Ferco International, an affiliate of G-U Hardware, Inc., the United States subsidiary of Gretsch-Unitas GmbH, obtained Canadian Patent Application No. 2,079,682 ("the '682 Ferco Patent Application")[2]. (Pl.'s 56.1 ¶ 157.) The '682 Ferco Patent Application describes and claims a casement window operator ("the GU/Ferco Operator"). (Pl.'s 56.1 ¶ 158.) The '682 Ferco Patent Application was published on August 5, 1992. (Pl.'s 56.1 ¶ 159.)

_____

[2]The exhibit submitted in support of this fact indicates that it is a patent application and not a patent. Exhibit 40 does not indicate when a Canadian patent was issued.

The operator disclosed in the '682 Ferco Patent Application is for use in controlling the opening and closing of a window frame. (Pl.'s 56.1 ¶ 160.) The '682 Ferco Patent Application discloses an operator with a two-piece housing, comprised of a cover and a base that permits the operator to be mounted on a window frame. (Pl.'s 56.1 ¶ 161.)

The angle plate of the operator described in the '682 Ferco Patent Application is installed on the outside face of the frame at a distance from the casing box to fit the profile of the window frame. (Pl.'s 56.1 ¶ 163.) The placement of the angle plate of the '682 Ferco Patent Application's operator at a distance from the casing box to fit the profile of the frame forms a recess for the passage of the centering pins of the angle plate and for the lever. (Pl.'s 56.1 ¶ 164.) The recess in the '682 Ferco Patent Application's operator is formed by the angle plate, the rear face of the casing box and the centering pins and appears rectangular in cross-section. (Pl.'s 56.1 ¶ 165.) This recess accommodates a raised surface of a window frame between the vertical portion of the angle plate and the rear of the casing box and below the centering pins. (Pl.'s 56.1 ¶ 166.)

The operator disclosed in the '682 Ferco Patent Application has an arm pivotally secured to the operator's base, the casing box, that is attachable to the window sash for controlling movement of the sash. (Pl.'s 56.1 ¶ 169.) The operator disclosed in the '682 Ferco Patent Application has a worm disposed between the interior of the cover and the casing box that driveably engages the worm wheel connected to the link arm. (Pl.'s 56.1 ¶ 170.) The '682 Ferco Patent Application was not cited to the examiner and, thus, not considered during the examination of the '308 patent application. (Pl.'s 56.1 ¶¶ 232, 233.)

The GU/Ferco Operator was a competitor of Truth in the early 1990's. (Pl.'s 56.1 ¶ 173.) The GU/Ferco Operator does not have a mounting base with a flat planar bottom. (Pl.'s 56.1 ¶ 174.)

The GU/Ferco Operator was not cited to the examiner and, thus, was not considered during the examination of the '308 patent application. (Pl.'s 56.1 ¶¶ 230, 231.)

Andersen Windows makes a window operator that is described in United States Patent No. 5,623,784 ("'784 Kuersten Patent"). (Pl.'s 56.1 ¶ 179.) The Kuersten/Andersen Operator is a commercial embodiment of the '784 Kuersten Patent Operator. (Pl.'s 56.1 ¶ 180.) The Kuersten/Andersen Operator is used with a window sill for controlling the opening and closing of the sash of the window. (Pl.'s 56.1 ¶ 182.) The Kuersten/Andersen Operator has separate mounting flanges in its base, each flange having "depending sides to form a generally inverted U-shape." (Pl.'s 56.1 ¶ 184.) The Kuersten/Andersen Operator and the '784 Kuersten Patent were not cited to the examiner and, thus, were not considered during the examination of the '308 patent application. (Pl.'s 56.1 ¶¶ 234, 235, 236, 237.)

The Kuersten/Andersen Operator has an arm pivotally secured to the base and attachable to the sash for controlling the opening and closing of the window sash. (Pl.'s 56.1 ¶ 189.) The Kuersten/Andersen Operator has a worm gear disposed between a cover and the base that driveably engages the arm. (Pl.'s 56.1 ¶ 190.) The Kuersten/Andersen Operator does not have a mounting base with a flat planar bottom. (Pl.'s 56.1 ¶ 192.)

Truth now manufactures Pella's casement window hardware, including operators. (Pl.'s 56.1 ¶ 198.) A Pella Operator that was not manufactured by Truth has two separate metal pieces (each with a screw hole), extending downward from each short side of the generally rectangular bottom of the operator's bottom support, such that there is a coaxial space formed between the pairs of metal pieces. (Pl.'s 56.1 ¶ 199.) The coaxial space permits this Pella Operator to be attached to a window frame having a raised surface protruding therefrom such that the raised surface of the window frame

fits within the space. (Pl.'s 56.1 ¶ 200.) The Pella Operator does not have a mounting base with a flat planar bottom. (Pl.'s 56.1 ¶ 201.) The Pella Operator is designed to be attached to a non-flat planar surface on the sill of a window frame. (Pl.'s 56.1 ¶ 202.) The Pella Operator was not cited to the examiner and, thus, was not considered during the examination of the '308 patent application. (Pl.'s 56.1 ¶¶ 238, 239.)

A window operator invented by Axel Ahlgren is described and depicted in United States Patent No. 2,926,905 ("the '905 Ahlgren Patent"). (Pl.'s 56.1 ¶ 206.) The '905 Ahlgren Patent was assigned to the Amerock Corporation, a window manufacturer. (Pl.'s 56.1 Ex. 46.) The '905 Ahlgren Patent was issued March 1, 1960. (Pl.'s 56.1 Ex. 46.) The window operator described in the '905 Ahlgren Patent does not have a base with a flat planar bottom. (Pl.'s 56.1 ¶ 210.) At least copies of the '905 Ahlgren Patent were maintained by Truth in their files. (Pl.'s 56.1 ¶ 212.) The '905 Ahlgren Patent was not cited to the examiner and, thus, was not considered during the examination of the '308 patent application. (Pl.'s 56.1 ¶¶ 240, 241.)

The Truth 23 Series Operator is "face-mounted". (Pl.'s 56.1 ¶ 216.) "Face-mounted" means that the operator is attached to the raised portion of the window frame by being screwed to the side of the raised portion. (Def.'s 56.1 Ex. T2 ¶ 20.) A gasket or other sealing device could be used with the Truth 23 Series Operator to prevent air and water infiltration. (Pl.'s 56.1 ¶ 217.) The Truth 23 Series Operator does not have a mounting base with a flat planar bottom. (Pl.'s 56.1 ¶ 218.) The Truth 23 Series Operator is designed to be attached to a non-flat planar surface of a window frame. (Pl.'s 56.1 ¶ 219; Def.'s 56.1 Ex. T2 ¶ 20.) The Truth 23 Series Operator and Truth 23 Series product literature were not cited to the examiner and, thus, were not considered during the examination of the '308 patent application. (Pl.'s 56.1 ¶¶ 242, 243.)

Truth, and particularly Truth Inventor Johnson, routinely obtained samples of and analyzed competitors' window operator products. (Pl.'s 56.1 ¶ 261.) Johnson became a Truth design engineer beginning in December 1994. (Pl.'s 56.1 ¶ 262.) As a design engineer, Johnson had product development duties, including detailed design for casement and awning locks and operators. (Pl.'s 56.1 ¶ 263.) As a design engineer, Johnson supervised two drafters, Anderson and Tim Frenzen, until he became engineering manager in approximately May 1997. (Pl.'s 56.1 ¶ 264.) Johnson attended "benchmarking" meetings before, during and after the prosecution of the '308 patent. (Pl.'s 56.1 ¶ 267.)

Johnson was the Truth employee primarily responsible for dealing with the patent attorneys in connection with prosecution of the '308 patent. (Pl.'s 56.1 ¶ 288.) Anderson routinely informed Johnson of the substance of any remarks made or material given by Anderson to Truth's patent counsel. (Pl.'s 56.1 ¶ 289.) At patent counsel's request, Anderson sent Jeff Clark samples of the Roto Frank/Interlock Operator and the Arthur Shaw Operator. (Pl.'s 56.1 ¶ 291.) After Paul Craane examined the Roto Frank/Interlock Operator, Jeff Clark returned it to Truth and requested "installation instructions" for the operator. (Pl.'s 56.1 ¶ 295.)

Anderson determined the proper dimensions for Truth's operator slot by measuring the raised surfaces that window manufacturers already were leaving on their frames. (Pl.'s 56.1 ¶ 278.)

The Truth Inventors had a working understanding of what the PTO meant by "prior art" and the "duty of candor". (Pl.'s 56.1 ¶ 280.) Jeff Clark ("Clark"), one of the attorneys who prosecuted the '308 patent, testified that he informed the Truth Inventors of the duty of candor and asked them to provide him and his firm with prior art that the Truth Inventors thought relevant. (Pl.'s 56.1 ¶ 281.) However, Anderson testified that no one ever asked him to provide the patent prosecutor with

*any* prior art he thought to be relevant but, instead, asked for specific operators. (Pl.'s 56.1 Ex. 8 at 89:1-18.) Clark and Paul Craane ("Craane"), another attorney who worked on the prosecution of the '308 patent, performed no independent search for prior art in connection with the '308 patent application. (Pl.'s 56.1 ¶ 282.) The Truth Inventors testified that they believed that such a search had been performed by Truth's attorneys. (Pl.'s 56.1 Ex. 8 at 101:12-102:8.; Pl.'s 56.1 Ex. 7 at 28:11-20.)

On October 30, 1995, Craane discussed the Roto Frank/Interlock Operator with Anderson. (Pl.'s 56.1 ¶ 298.)

The Truth Inventors did not produce to patent counsel or to the PTO samples of the Kuersten/Andersen, Pella, Truth 23 Series, GU/Ferco Operators. (Pl.'s 56.1 ¶¶ 310, 311, 312, 313.) The Truth Inventors did not produce copies of the '905 Ahlgren and '582 Interlock Patents to patent counsel. (Pl.'s 56.1 ¶¶ 314, 315.) Each of the Truth Inventors, except Tucker who had died, read, approved and signed the '308 patent application. (Pl.'s 56.1 ¶ 319.) Truth's patent counsel sent the Truth Inventors copies of various Office Actions relating to the '308 patent application and asked them for information to prepare the responses. (Pl.'s 56.1 ¶ 320.) The '308 patent application was pending for two-and-a-half years. (Pl.'s 56.1 ¶ 321.)

Ashland began a project to design its 1040 operators in mid-1995. (Pl.'s Add. 56.1 ¶ 24.) To assist in the design of the new operator, Ashland engineers examined samples of casement window operators manufactured by its sister company, Amerock. (Pl.'s Add. 56.1 ¶ 25.) Ashland engineers also acquired and studied samples of other prominent casement window operators being sold in 1995 – the Roto Frank/Weitman, the Pella, the Truth 23 Series and the Truth 15 Series Operators. (Pl.'s Add. 56.1 ¶ 27.) The Ashland engineers met with certain prospective customers–

Simonton Windows ("Simonton"), Sunrise Windows ("Sunrise"), and MBS/Polaris Windows ("MBS/Polaris") – to ascertain the particular features that those customers wanted in a casement window operator. (Pl.'s Add. 56.1 ¶ 33.) During this time, Ashland performed patent searches and reviewed patents that were found. (Pl.'s Add. 56.1 ¶ 62.) By mid-1996, the design of the fundamental features of Ashland's operator was complete. (Pl.'s Add. 56.1 ¶ 39.) In May 1996, after Ashland's core design was complete, Truth introduced the operator claimed in the '308 patent. (Pl.'s Add. 56.1 ¶ 40.)

## DISCUSSION

### *Invalidity*

Ashland argues that summary judgment on the issue of invalidity is appropriate because: (1) the '308 patent claims are anticipated by the Roto Frank/Weitman Operator, the Roto Frank/Interlock Operator, the '582 Interlock Patent, the Interlock PCT Patent, the GU/Ferco Operator, the '682 Patent Application, the Pella Operator, the '905 Ahlgren Patent, the Kuersten/Andersen Operator, and the '784 Kuersten Patent; and (2) the claimed invention was obvious to persons of ordinary skill in the art in 1995 when the '308 patent application was filed.

A claimed invention is "anticipated", and, thus, not novel and not patentable if, before invention by the patentee, it was known, used, sold, or described in a printed publication. 35 U.S.C. § 102. In an anticipation analysis, the claims are first construed. *Helifix*, 208 F.3d at 1346. Second, the court will compare the construed claim to the prior art. *Helifix*, 208 F. 3d at 1346. "To be anticipating, a [single] prior art reference must disclose 'each and every limitation of the claimed invention[,] . . . must be enabling[,] and [must] describe . . . [the] claimed invention sufficiently to have placed it in possession of a person of ordinary skill in the field of the invention.'" *Helifix*, 208

-18-

F.3d at 1346 (quoting *In re Paulsen*, 30 F.3d 1475, 1478-79 (Fed. Cir. 1994)). The prior art

reference must enable a person of ordinary skill in the art to make or obtain the claimed invention

without an undue amount of experimentation. *Helifix*, 208 F.3d at 1348.

> [A] prior art reference may [also] anticipate when the claim limitation or limitations
> not expressly found in that reference are nonetheless inherent in it. . . . Under the
> principles of inherency, if the prior art necessarily functions in accordance with, or
> includes, the claimed limitations, it anticipates. . . . Artisans of ordinary skill may not
> recognize the inherent characteristics or functioning of the prior art.

*Mehl/Biophile Int'l Corp. v. Milgraum*, 192 F.3d 1362, 1365 (Fed. Cir. 1999).

Ashland argues that the window operators and patents noted above disclose each and every

limitation of the '308 patent either explicitly or inherently.

Comparison of the claimed invention with the prior art demonstrates that the claim

limitations are inherent or explicit in the prior art. Each prior art operator discloses a window

operator and window frame "or a window having a sash movable relative to said frame between open

and closed positions" as claimed in Claims 1 and 5 of the '308 patent. Each prior art operator may

be used with the raised portion of a window frame as claimed in Claims 1 and 5 of the '308 patent.

Each prior art operator discloses a base having an interior support surface with a slot within which

the raised surface of the window frame may fit as claimed in Claims 1 and 5. Each prior art operator

has an arm that is secured to the base and is attached to the sash to control the opening and closing

of the window as claimed in Claims 1 and 5. Each prior art operator has a worm disposed in the

interior support surface that driveably engages the arm as claimed in Claims 1 and 5. Each prior art

operator's slot is of rectangular cross-section as claimed in Claims 2 and 6. Each prior art operator

has a cover that can be combined with the base to form a sealing surface as claimed in Claims 3 and

7. A person of ordinary skill in the art in 1995 would have fitted a gasket around the sealing surface

of each of the prior art operators as claimed in Claims 4 and 8. Use of a "packer" or "shim" with the base of the prior art operators created a slot that could accommodate a raised wall in its slot to prevent the infiltration of air and water into the home.

Once a "packer" or "shim" is used with the bases of the prior art operators, "the prior art [operators] necessarily function[] in accordance with, or include[], the claimed limitations" and, therefore, anticipate the claims in the '308 patent. *Mehl/Biophile*, 192 F.3d at 1365. Therefore, Ashland's motion for summary judgment of invalidity is granted on the ground of anticipation.

Alternatively, the '308 patent claims are invalid under 35 U.S.C. § 103 (2002). "A patent may not be obtained[,] though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the [relevant] art." 35 U.S.C. § 103.

Obviousness is a question of law resting on underlying factual inquiries. *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1284 (Fed. Cir. 2000). Those factual inquiries are (1) the scope and content of the prior art, (2) the differences between the claimed invention and the prior art, (3) the level of ordinary skill in the art, and (4) other secondary considerations. *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966). There must be a reasonable expectation of success. *In re O'Farrell*, 853 F.2d 894, 903 (Fed. Cir. 1988). Secondary considerations include commercial success, long-felt but unsolved needs, and failure of others. *Graham*, 383 U.S. at 18. Once a party has set forth a *prima facie* case of obviousness, the patent owner may rebut the *prima facie* case with secondary considerations. *See Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1376 (Fed. Cir. 2000).

Ashland argues that the claimed invention was obvious in light of the prior art operators that contained a "slot" and could combine with the raised portion of a window frame.

The undisputed facts establish that the operator claimed in the '308 patent was obvious in light of the prior art. In 1995, there were several window operators for use on a casement window, and many window manufacturers were leaving raised surfaces on their window frames. The only functional difference between the claimed operator and the prior art operators is that the base of the claimed operator is composed of one piece while the bases of the prior art operators are composed of multiple pieces. The bases of the prior art operators can be combined with the raised portion of a window frame. The bases of the prior art operators contain openings, sometimes created by a "packer" or "shim", that can accommodate the raised portion of a window frame. All of the prior art operators contain arms and worms in the same manner as the operator claimed in the '308 patent. Thus, it would have been obvious to eliminate the need for a "packer" or "shim" by making the base a single piece.

The Interlock PCT patent teaches air and water infiltration through the combination of a base having a slot and the raised portion of the window frame. The Interlock PCT patent discloses that when the Interlock Patent Operator is installed with a "packer" to a window frame with a raised surface, the gap, or slot, formed between the packer and the raised surface provides "a clear channel should any water or moisture get in behind the packer." (Pl.'s 56.1 Ex. 37 at 9 ll. 13-14.) Thus, Ashland has set forth a *prima facie* case of obviousness.

Moreover, secondary considerations do not rebut Ashland's *prima facie* case of obviousness. Others had not tried and failed to create a window operator that could combine with the raised portion of a window frame to prevent air and water infiltration. Rather, the evidence presented

-21-

shows that, in 1995, others had successfully created and marketed to consumers window operators that could combine with the raised portion of a window frame, sometimes through the use of a "packer" or "shim", along with a gasket, to prevent air and water infiltration. Others had not created a window operator with a base composed of a single piece that could achieve this feat. However, doing so was not beyond one of ordinary skill in the art. It is undisputed that Ashland's engineers came up with the same design by studying prior art operators without any knowledge of Truth's claimed invention in 1995 to 1996. Furthermore, it is undisputed that the claimed invention was not a commercial success at the time it was first released. Therefore, Ashland's motion for summary judgment of invalidity is granted on the ground of obviousness.

Because the Court finds that the '308 patent is invalid, it need not reach the issue of whether Ashland has infringed the '308 patent.

*Inequitable Conduct*

Patent applicants and their representatives are required to prosecute patents in the PTO with candor, good faith, and honesty. *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed. Cir. 1995). Inequitable conduct occurs when a patent applicant, with an intent to deceive, affirmatively misrepresents a material fact, fails to disclose material information, or submits false material information. *Molins*, 48 F.3d at 1178. The proponent must prove the elements of materiality and intent by clear and convincing evidence. *Molins*, 48 F.3d at 1178-79. "Clear and convincing evidence" is evidence which gives the trier of fact "an abiding conviction that the truth of [the] factual contentions [is] 'highly probable'." *Buildex Inc. v. Kason Indus., Inc.*, 849 F.2d 1461, 1463 (Fed. Cir. 1988) (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)). "A determination of inequitable conduct is committed to the district court's discretion." *Refac Int'l, Ltd. v. Lotus*

*Development Corp.*, 81 F.3d 1576, 1580 (Fed. Cir. 1996). The Court will weigh the finding of materiality and intent in light of all the circumstances in determining whether inequitable conduct occurred. *Refac*, 81 F.3d at 1581. Materiality and intent are questions of fact. *GFI, Inc. v. Franklin Corp.* 265 F.3d 1268, 1273 (Fed. Cir. 2001).

"Information is 'material' when there is a substantial likelihood that a reasonable examiner would have considered the information important in deciding whether to allow the application to issue as a patent." *Molins*, 48 F.3d at 1179. There is a substantial likelihood that a reasonable examiner would have considered the information disclosed by the patents and window operators named above important in deciding whether to allow the '308 patent to issue. As discussed in greater detail above, the patents and window operators disclosed sufficient information to put a person of ordinary skill in the art in possession of the claimed invention or gave them at least a reasonable expectation of success in making the claimed invention. Thus, the patents and window operators were material.

There is no direct evidence of deceitful conduct. Thus, "[th]e intent element of [inequitable conduct must be] . . . proven by inferences from facts, with the collection of inferences permitting a confident judgment that deceit has occurred." *GFI*, 265 F.3d at 1274. However, the Court cannot presume intent from the materiality of the withheld documents. *GFI*, 265 F.3d at 1274. Rather, "a court must weigh all the evidence, including evidence of good faith." *GFI*, 265 F.3d at 1274. But mere denials of intent to mislead are insufficient to prevent a determination of inequitable conduct. *GFI*, 265 F.3d at 1275.

There is a genuine issue of material fact as to whether the Truth Inventors intended to mislead the PTO. It is undisputed that the patents and window operators were not disclosed to the PTO

-23-

during the pendency of the '308 patent application. It is also undisputed that the patents that were

disclosed to the PTO described window operators that were unlike those described in the patents and

embodied in the window operators described above. However, while Clark testified that he informed

the Truth Inventors of the duty of candor and asked them to provide him with prior art the Truth

Inventors thought was relevant, Anderson testified that no one ever asked him to provide patent

counsel with prior art Anderson thought was relevant but, rather, asked for specific window

operators. The Truth Inventors testified that they had thought that a patent search had been

performed by patent counsel. Patent counsel requested and received certain window operators and

determined that they were not material and did not need to be disclosed to the examiner[3]. While

copies of the '905 Ahlgren and '582 Interlock Patents were produced from Truth's files in the course

of discovery and Truth maintained a drawer with samples of competitors' products, the evidence

presented does not establish that the Truth Inventors withheld these references with intent to deceive

but equally supports the conclusion that the references were not disclosed based on a good faith

belief that the references were not material. The issue of intent to mislead turns on the credibility

of the relevant witnesses [4] and must be reserved for trial. Therefore, Ashland's Motion for Summary

Judgment on the Issue of Inequitable Conduct is denied.

---

[3]Plaintiff asserts in its Local Rule 56.1 Statement of Undisputed Facts that the Truth
Inventors intentionally omitted "packers" from the prior art window operators sent to patent
counsel in order to deceive the PTO. However, the references cited in support did not establish
that assertion as an undisputed fact.

[4]A former employee of Truth, Greg Jefferson, testified that he and other Truth Inventors
incorporated the "slot" feature from the Roto Frank window operator into the Truth operator's
one-piece base. However, the testimony from the other Truth Inventors disputed this fact,
making the determination of whether the Truth Inventors intentionally copied this feature and
then withheld material information in order to deceive the PTO turn on a determination of the
credibility of the witnesses.

## CONCLUSION

For the reasons stated herein, Ashland's Motion for Summary Judgment is granted on the issue of patent invalidity and denied on the issue of inequitable conduct. Truth's Motion for Summary Judgment on the issue of patent infringement is denied as moot.

**IT IS SO ORDERED.**

John W. Darrah, Judge
United States District Court

Date: December 11, 2002