Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 5786 | **DATE** | 7/1/2003 |
| **CASE TITLE** | ASHLAND PRODUCTS, INC. vs. TRUTH HARDWARE CORPORATION | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due _____. Reply to answer brief due _____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion And Order. Judgment is entered in favor of Ashland Products, Inc. and against Truth Hardware Corporation.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | **Document Number** |
| | Notices mailed by judge's staff. | | JUL 0 3 2003 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | 154 |
| ✓ | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| | | 03 JUL -2 PM 7:03 | date mailed notice | |
| LG | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ASHLAND PRODUCTS, INC., ) | |
| ) | |
| Plaintiff/Counter-Defendant, ) | |
| ) | Case No. 99 C 5786 |
| v. ) | |
| ) | Hon. John W. Darrah |
| TRUTH HARDWARE CORPORATION,) | |
| ) | |
| Defendant/Counter-Plaintiff. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Ashland Products, Inc. ("Ashland"), filed a two-count complaint against Defendant, Truth Hardware Corporation ("Truth"), seeking a declaratory judgment that Ashland has not infringed Truth's Patent No. 5,765,308 ("the '308 patent") and that the '308 patent is invalid and unenforceable. The '308 patent makes eight claims (two independent claims, each having three dependent claims) directed to a window operator used in combination with a window frame. Truth subsequently filed a counterclaim for infringement and injunctive relief.

After a *Markman* hearing was held and briefs were submitted, the Court construed the disputed terms in the '308 patent in a Memorandum Opinion and Order dated May 29, 2002. Ashland then moved for summary judgment on the basis of patent invalidity and inequitable conduct. Truth moved for summary judgment on the issue of patent infringement. Ashland was granted summary judgment on the issue of patent invalidity. The Court denied summary judgment on the issue of inequitable conduct and held that there were genuine issues of material fact as to whether the inventors intended to mislead the Patent and Trademark Office ("PTO") by withholding material prior art. Truth's motion for summary judgment on infringement was denied as moot.

There was a trial by the Court without a jury on the issue of inequitable conduct, *i.e.*, whether

the Inventors intended to deceive the PTO (a) by knowingly withholding material prior art and (b) by affirmatively misrepresenting the state of the art during the prosecution of the '308 patent, by clear and convincing evidence. Testimony from several witnesses was heard over three days, and exhibits were admitted into evidence.

For the reasons discussed below, judgment is entered in favor of Ashland and against Truth.

Pursuant to Federal Rule of Civil Procedure 52, the Court hereby enters the following written Findings of Fact and Conclusions of Law which are based upon consideration of all the admissible evidence as well as this Court's own assessment of the credibility of the trial witnesses. To the extent, if any, that Findings of Fact, as stated, may be considered Conclusions of Law, they shall be deemed Conclusions of Law. Similarly, to the extent that matters expressed as Conclusions of Law may be considered Findings of Fact, they shall also be deemed Findings of Fact.

## FINDINGS OF FACT

*Preliminary Findings*

Ashland is a Delaware corporation with its principal place of business in Illinois. Truth is a Delaware corporation with its principal place of business in Minnesota. Truth and Ashland are competing manufacturers and sellers of window hardware products, including window operators, a mechanical device for opening and closing a window sash within the frame.

The '308 patent application was filed on December 19, 1995. The '308 patent names as inventors former Truth employees Todd A. Anderson ("Anderson") and Daniel G. Tucker ("Tucker") and current Truth employees James G. Seaser ("Seaser") and Douglas G. Johnson ("Johnson") (collectively "the Truth Inventors"). Tucker died before the filing of the '308 patent application. Truth is the assignee of the '308 patent.

The '308 patent generally relates to a mechanical "operator" that is used to open and close a casement window in conjunction with a window frame having a raised surface protruding therefrom. The issued claims of the '308 patent are directed to the combination of a window operator having a "slot" and a window frame having a "raised portion". The '308 patent specification states that then-existing window operators "typically [had] a mounting base with a flat planar bottom secured to a corresponding flat planar surface on a sill of the frame." According to the '308 patent specification, the flat planar base/flat planar sill interface permitted air and/or water to infiltrate into the home. The slot/raised surface interface of the invention claimed in the '308 patent prevented air and/or water infiltration by eliminating the "flat planar surface" and permitting the retention of a "wall" on the window frame to block air and water.

The original application for the '308 patent disclosed five prior art references: United States Patent Nos. 4,253,276; 4,266,371; 4,445,794; 4,505,601; and 4,845,830. Each of these patents are assigned to Truth. Each of these patents show only window operators having "flat planar bottom[s]". During the prosecution of the '308 patent, the Truth Inventors identified only one competitor's window operator product to the PTO, an Arthur Shaw operator, two months after the filing of the '308 patent. The '308 patent issued on June 16, 1998.

On May 29, 2002, the Court construed the term "base", as used in the '308 patent, to mean "the bottom support of the operator; the piece (or multiple pieces) that support the remainder of the operator and/or permit the operator to be mounted to a window frame." In the May 29, 2002 Order, the Court also held that the term "base" does not require a single-piece construction.

In the May 29, 2002 Order, the Court construed the term "slot", as used in the '308 patent,: to mean "a groove or opening in the bottom exterior surface of a window operator's bottom support

that accommodates a raised surface of a window frame." The Court also held that the "slot" need not be continuously bounded or formed in and/or by a single base piece. The Court stated

> The '308 patent teaches the prevention of air and water infiltration through a "raised wall of rectangular cross-section extending along a sill on a frame that fits substantially within the slot when the operator is secured to the frame. The wall prevents the unobstructed flow of air and water along the bottom of the base and the sill." '308 Patent, Col. 6, ll. 4-8.

*Ashland Prods., Inc. v. Truth Hardware Corp.*, No. 99 C 5786, 2002 WL 1160938, at *2 (N.D. Ill. May 29, 2002).

*Inventors' Conduct*

Truth began its project to design the casement window operator that was claimed in the '308 patent ("the '308 Project") in February 1993. Greg Jefferson ("Jefferson"), Truth's former Product Manager for casement window hardware, initially led the '308 Project. Jefferson maintained a close relationship with the sales and engineering departments, obtaining competitors' samples through the sales department and making customer visits with sales personnel. Tucker, a Truth engineer until his death in 1994, worked closely with Jefferson on the '308 Project. Anderson, a drafter reporting to Jefferson and to the design engineers on the '308 Project, was intimately involved in helping each of the engineers design the product and draft the results of their efforts. Jefferson worked closely with both Anderson and Johnson on the '308 Project.

Johnson became a Truth design engineer beginning in December 1994. As a design engineer, Johnson had product development duties, including detailed design for casement and awning locks and operators. Upon joining the '308 Project team in late 1994, Johnson met with Jefferson on numerous occasions and was fully informed of the '308 Project's goals, design history and target competitor products. As a design engineer, Johnson supervised two drafters, Anderson and Timothy

Frenzen, until Johnson became engineering manager in approximately May 1997. Johnson was the Truth Inventor with the most knowledge about competitors and their product offerings.

One of Johnson's job responsibilities was to be familiar with competitors' products. Johnson routinely obtained samples of and analyzed competitors' window operator products. Johnson attended weekly "benchmarking" meetings before, during, and after the prosecution of the '308 patent.

The new operator developed during the '308 Project was intended to supplement Truth's single-arm and dual-arm operators, known as the 15 Series NA and NC operators. The NA and NC operators encapsulated the worm gear in a solid, single-piece housing.

Truth launched the '308 Project principally in response to competition from Wright Products ("Wright"), which was selling a lower-cost version of Truth's single-arm NA operator. One of the goals of the '308 Project was to lower the costs of manufacturing a casement window operator. Another goal of the '308 Project was to design an operator that reduced air and water infiltration into the home at the operator/window frame interface.

Among the companies that were manufacturing casement window operators for the United States market in 1993-1994 were Truth; Amerock Hardware ("Amerock") for Andersen Windows ("Andersen"); Pella Windows ("Pella"); Roto Frank Hardware ("Roto Frank"); Wright; G-U Hardware ("GU"), the U.S. subsidiary of Gretsch-Unitas GmbH; Mila; and Arthur Shaw. In 1993, when the '308 Project began, Roto Frank was distributing an operator produced by Wilhelm Weitman, Inc. ("the Roto Frank/Weitman Operator"). The Roto Frank/Weitman Operator is depicted in a Roto Frank brochure bearing a 1991 copyright date.

The Roto Frank/Weitman Operator was distributed by Roto Frank from approximately 1991

through 1996. The Roto Frank/Weitman Operator did not have a mounting base with a flat planar bottom. It was designed to be attached to a non-flat planar surface on a sill of a window frame. The Roto Frank/Weitman Operator had a slot created by placing a plastic piece, also known as a spacer, under the exterior portion of the operator, such that a space remained between the spacer and the wall of the operator housing. The inverted U-shape opening in the Roto Frank/Weitman Operator permitted the operator to be secured to a window frame having a raised portion. The inverted U-shape opening can be seen in a properly assembled Roto Frank/Weitman Operator containing a spacer.

Roto Frank and other Truth competitors routinely displayed their products, including their casement window hardware, at trade shows throughout the 1990's and during the '308 Project. During the '308 Project and the prosecution of the '308 patent application, Truth gathered information about its competitors and its competitors' operators through its sales personnel who visited window manufacturers that were not using Truth's products and attended fenestration industry trade shows. Truth sales personnel then communicated this information to Truth engineers and managers through sales reports. Roto Frank and other Truth competitors routinely displayed their casement window hardware at trade shows during the '308 Project. Prior to commencement of the '308 Project, many window manufacturers had been leaving a "raised surface" on their window frames, usually a portion of the window frame's "tower". When developing the sealable operator, Johnson and Anderson used data that Truth gathered from numerous customers regarding the dimensions of their "tower" to determine the appropriate dimensions for the Truth operator's slot feature.

Certain window manufacturers, including MBS/Polaris, actually used the Roto

Frank/Weitman Operator to accommodate a raised surface on a window frame. Truth knew that window manufacturers found the Roto Frank/Weitman Operator's ability to accommodate a raised surface on a window frame to be desirable.

During the '308 Project, samples of competitors' operators were kept in a drawer in the Product Manager's office at Truth. Truth's personnel knew about the sample drawer, and these samples were available for examination by Truth employees. Johnson was familiar with the samples kept in the drawer. At least one sample of the Roto Frank/Weitman Operator, the Kuersten/Andersen Operator, and the 23 Series Operator were present in the Truth sample drawer on or before the '308 patent's filing date. Jefferson saw the Roto Frank/Weitman Operator. When Jefferson realized the desirability of the "slot" feature, he distributed it to numerous Truth engineering personnel for assistance in adding that feature to the Truth operator. Several Truth employees, including Tucker; Jefferson; Johnson; Anderson; Seaser; and Greg Wobschall, Truth's current President, examined the Roto Frank/Weitman Operator and/or were aware of the existence of this operator during the '308 Project.

Tucker and Jefferson appropriated the idea for a slot in the base of the Truth "sealable" operator from the Roto Frank/Weitman Operator. In order to eliminate the spacer used in the Roto Frank/Weitman Operator's base, Truth incorporated Roto Frank's "slot" or "channel" design into a one-piece base.

Neither the Roto Frank/Weitman Operator nor the 1991 Roto Frank brochure were cited to the '308 patent examiner by the Inventors. The examiner did not consider them when examining the '308 patent application.

Sometime in 1994, Roto Frank began distributing a casement window operator manufactured

by Interlock Industries Ltd. ("the Roto Frank/Interlock Operator"). The Roto Frank/Interlock Operator is described in Interlock Industries Ltd.'s International Patent WO 95/18284 ("the Interlock PCT patent"). The Interlock PCT patent was published on July 6, 1995. The Roto Frank/Interlock Operator is described in the United States counterpart to the Interlock PCT patent, United States Patent No. 5,937,582 ("the '582 Interlock patent"). Two copies of the '582 Interlock patent were kept in Truth's files. The Roto Frank/Interlock Operator is generally the same as the operator depicted in the Interlock PCT patent and in the '582 Interlock patent.

The Roto Frank/Interlock Operator does not have a mounting base with a flat planar bottom. The Roto Frank/Interlock Operator is designed to be attached to a non-flat planar surface on a sill of a window frame. The lower metal housing of the Roto Frank/Interlock Operator combines with a "packer", *i.e.*, a plastic piece, that fits under the mounting surface to form a base that supports the remainder of the operator. The opening in the base of the Roto Frank/Interlock Operator accommodates a raised surface of a window frame. Without the packer, nothing in the Roto Frank/Interlock Operator demonstrates or suggests that the operator can be sill-mounted over a raised surface on a window frame. Johnson and Anderson were aware of the Roto Frank/Interlock Operator on or before the '308 patent's filing date. Johnson and Anderson were aware of the Roto Frank/Interlock Operator on or before the '308 patent's issue date.

The Roto Frank/Interlock Operator, the Interlock PCT patent, and the '582 Interlock patent were not cited to the examiner by the Inventors. The examiner did not consider them when examining the '308 patent application.

Before December 19, 1995, Ferco International, an affiliate of GU, filed Canadian Patent Application No. 2,079,682 ("the '682 Ferco Patent Application"). The '682 Ferco Patent

Application was published on August 5, 1992. The '682 Ferco Patent Application describes and claims a casement window operator ("the GU/Ferco Operator"). The GU/Ferco Operator does not have a mounting base with a flat planar bottom. It is designed to be attached to a non-flat planar surface on a sill of a window frame. It is installed on the outside face of the frame at a distance from the casing box to fit the profile of the window frame. The recess in the GU/Ferco Operator is formed by the angle plate, the rear face of the casing box and the centering pins and appears rectangular in cross-section. The GU/Ferco's recess accommodates a raised surface of a window frame between the vertical portion of the angle plate and the rear of the casing box and below the centering pins.

The GU/Ferco Operator was a competitor of Truth's operators in the early 1990's. Johnson was aware of the GU/Ferco Operator on or before the '308 patent's filing date and date of issuance. However, neither the GU/Ferco Operator nor the '682 Ferco Patent were cited to the examiner. The examiner did not consider them when examining the '308 patent application.

In 1994, Andersen was distributing a window operator described in U.S. Patent No. 5,623,784 ("the '784 Kuersten patent"). That operator ("the Kuersten/Andersen Operator") is a commercial embodiment of the '784 Kuersten patent. The Kuersten/Andersen Operator does not have a mounting base with a flat planar bottom. The Kuersten/Andersen Operator is designed to be attached to a non-flat surface on a sill of a window frame. The Kuersten/Andersen Operator has separate mounting flanges in its base, each flange having "depending sides to form a generally inverted U-shape". Johnson was aware of the Kuersten/Andersen Operator on or before the filing of the '308 patent application and the issuance of the '308 patent. However, neither the Kuersten/Andersen Operator nor the '784 Kuersten patent were cited to the examiner. The examiner did not consider them when examining the '308 patent application.

As of December 1995, Pella was a manufacturer of windows in the United States and a potential customer and competitor of Truth. Truth now manufactures Pella's casement window hardware, including operators. A Pella casement window operator ("the Pella Operator") that was not manufactured by Truth has two separate metal pieces (each with a screw hole) extending downward from each short side of the generally rectangular bottom of the operator's bottom support, such that there is a coaxial space formed between the pairs of metal pieces. The coaxial space permits the Pella Operator to be attached to a window frame having a raised surface protruding therefrom such that the raised surface of the window frame fits within the space. The Pella Operator does not have a mounting base with a flat planar bottom. It is designed to be attached to a non-flat planar surface on a sill of a window frame. It had been manufactured and distributed by Pella since the early 1960's. Johnson was aware of the Pella Operator on or before the '308 patent's filing date and date of issuance. The Pella Operator was not cited to the examiner and was not considered by the examiner during the examination of the '308 patent application.

A window operator invented by Axel Ahlgren is described and depicted in U.S. Patent No. 2,926,905 ("the '905 Ahlgren patent"). The '905 Ahlgren patent was issued on March 1, 1960, and was assigned to Amerock. The window operator described in the '905 Ahlgren patent does not have a mounting base with a flat planar bottom and was designed to be attached to a non-flat surface on a sill of a window frame. At least two copies of the '905 Ahlgren patent were maintained by Truth in their files. The '905 Ahlgren patent was not cited to the examiner. The examiner did not consider the '905 Ahlgren patent when examining the '308 patent application.

Since the 1960's, Truth has sold the "23 Series Operator" in its operator product line. The 23 Series Operator is "face-mounted", meaning that the operator is attached to the raised portion of

the window frame by being screwed into the side of the raised portion. It does not have a mounting base with a flat planar bottom and is designed to be attached to a non-flat planar surface on a sill of a window frame. Johnson, Tucker, Jefferson, and Anderson were aware of the 23 Series Operator. However, the 23 Series Operator was not cited to the examiner and was not considered by the examiner during the examination of the '308 patent application.

In summary, the Truth Inventors did not inform the '308 patent examiner that many window manufacturers were using a variety of operators to accommodate raised surfaces on their window frames prior to the introduction of the operator claimed in the '308 patent. Thus, this fact was not considered by the examiner during the examination of the '308 patent application.

The '308 patent was prosecuted by patent attorneys, Jeff Clark ("Clark") and Paul Craane ("Craane"), of the law firm of Wood Phillips. Prior to the prosecution of the '308 patent, Wood Phillips had prosecuted dozens of Truth patents in the field of window hardware. Clark had handled or supervised the handling of all Truth's patent applications for window operators. Only Johnson and Anderson were involved in the prosecution of the '308 patent. The Truth Inventors, Johnson and Anderson, were much more familiar with available window operator products than were Clark and Craane. Anderson routinely informed Johnson of the substance of any remarks made or material given by Anderson to patent counsel in connection with the '308 patent application.

Clark and Craane informed Truth of the duty of candor and asked them to provide counsel with prior art that they thought relevant. The Truth Inventors had a working understanding of what the PTO meant by "prior art" and the "duty of candor".

Johnson prepared an "Information Supplemental to Disclosure of Invention Form" for his attorneys, signed by Johnson and Anderson on October 5, 1995. Johnson and Anderson understood

-11-

that the disclosure form was created in consultation with Truth's patent counsel and was for use by Truth's patent counsel in preparing a possible patent application. The disclosure form contained a section entitled "Prior Art", in which the preparer or preparers were asked to detail any potentially relevant prior art of which they were aware. The disclosure form prepared by Johnson and signed by Johnson and Anderson identified no prior art other than Truth's 15 Series NA and NC operators, which had "flat planar bottoms" for securing "to corresponding flat planar surface[s] on a sill of the frame." The disclosure form prepared by Johnson was used by Clark and Craane to determine whether any features of the "sealable" operator were potentially patentable.

Neither Johnson nor Anderson informed patent counsel that window manufacturers were manufacturing window frames with raised surfaces. The Truth Inventors did not produce samples of or inform patent counsel of the Kuersten/Andersen, Pella, 23 Series, or GU/Ferco Operators. The Truth Inventors did not produce copies of the '905 Ahlgren and '582 Interlock patents to patent counsel. Clark and Craane relied on prior art information received from the Truth Inventors when preparing the '308 patent application and did not perform an independent search for prior art devices in connection with the '308 patent application.

On October 23, 1995, Johnson had a telephone conversation with Clark in which Johnson identified the Roto Frank/Interlock Operator and an Arthur Shaw Operator as potentially relevant prior art. After learning of these operators, Clark requested samples of the Roto Frank/Interlock and Arthur Shaw Operators. The Roto Frank/Interlock Operator was sent to Clark without the plastic packer piece necessary to form the operator's "slot". Crane photographed the operator in the incomplete condition in which it was received. (Ashland Trial Ex. 59.) Nor did Truth supply the missing packer piece to its patent attorneys. After Craane examined the Roto Frank/Interlock

-12-

Operator, Clark returned it to Truth and requested "installation instructions" for the operator. The Truth Inventors never sent patent counsel "installation instructions" for the operator.

Without the packer, nothing in the Roto Frank/Interlock Operator demonstrates or suggests that the operator can be sill-mounted over a raised surface on a window frame. A Roto Frank/Interlock Operator was discovered from Truth's sample drawer. The plastic packer piece which formed the "slot" was with the operator.

On October 30, 1995, Craane specifically discussed the Roto Frank/Interlock Operator with Anderson. Craane memorialized that discussion. During that discussion, Anderson

> pointed out [to Craane] that unlike the Roto [Frank/Interlock Operator], the [operator claimed in the '308 patent application] ha[d] a cut-out region in the underside of the base. The cut-out region in the underside of the base functions to fit around a built-up ledge on the frame. This built-up ledge on the frame acts as a small 'dam,' holding back or preventing the seepage of water along the underside of the operator into the living quarters. [Anderson] indicated that while other companies may use a gasket of one form or another that fits around a ledge on the operator, he ha[d] not seen [and was] not aware of an operator which uses such a small 'dam' to prevent the seepage of water into the living quarters.

(Ashland Trial Ex. 65.) Anderson's statements to Craane on October 30, 1995, were knowingly false and did not accurately reflect the state of the window operator art. Johnson was aware of Anderson's statements to Craane but did nothing to correct or contradict Anderson's statements.

Therefore, based on the prior art operators identified by Johnson and Anderson and Anderson's statements on October 30, 1995, patent counsel represented to the PTO that "[a] window operator typically has a mounting base with a flat planar bottom secured to a corresponding flat planar surface of a sill of the frame".

Moreover, the Truth Inventors never informed patent counsel of Jefferson's role in the '308 Project. Therefore, patent counsel never interviewed Jefferson to determine how the "slot" feature

was first incorporated into the Truth "sealable" operator or whether Jefferson knew of competitors' operators having similar "slot" features.

The Truth Inventors read, approved and signed the '308 patent application. Truth's patent counsel sent the Truth Inventors copies of various Office Actions relating to the '308 patent application and asked them for information to prepare the responses. During the prosecution of the '308 patent application, as noted above, Anderson signed a Declaration, under penalty of perjury, supporting an Information Disclosure Statement, which disclosed the Arthur Shaw Operator only and indicated that the prior art was limited to the Truth 15 Series NA and NC operators. Johnson and Anderson signed at least two Declarations, each assuring their compliance with the duty of candor. The '308 patent application was pending for two-and-a-half years.

## CONCLUSIONS OF LAW

Patent applicants and their representatives are required to prosecute patents in the PTO with candor, good faith, and honesty. *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed. Cir. 1995).

> A patent by its very nature is affected with a public interest. The public interest is best served, and the most effective patent examination occurs when, at the time an application is being examined, the Office is aware of and evaluates the teachings of all information material to patentability. . . . The duty to disclose information exists with respect to each pending claim until the claim is cancelled or withdrawn from consideration, or the application becomes abandoned. . . . However, no patent will be granted on an application in connection with which fraud on the Office was practiced or attempted or the duty of disclosure was violated through bad faith or intentional misconduct.

37 C.F.R. § 1.56(a); *Fox Indus., Inc. v. Structural Preservation Sys., Inc.*, 922 F.2d 801, 803 (Fed. Cir. 1991) ("The duty of disclosure extends throughout the patent's entire prosecution history.").

Inequitable conduct occurs when a patent applicant, with an intent to deceive, affirmatively misrepresents a material fact, fails to disclose material information, or submits false material

-14-

information. *Molins*, 48 F.3d at 1178. "Determination of inequitable conduct, for establishing that a patent is unenforceable, requires a two-step analysis. First, the trial court must determine whether the withheld information meets a threshold level of materiality." *Brasseler, U.S.A. I v. Stryker Sales Corp.*, 267 F.3d 1370, 1379 (Fed. Cir. 2001). "Information is 'material' when there is a substantial likelihood that a reasonable examiner would have considered the information important in deciding whether to allow the application to issue as a patent." *Molins*, 48 F.3d at 1179. "Second, the district court must then also determine whether the withheld information meets a threshold level of intent to mislead the PTO." *Brasseler*, 267 F.3d at 1379. A patent obtained through inequitable conduct is unenforceable. *Molins*, 48 F.3d at 1177.

The proponent must prove the elements of materiality and intent by clear and convincing evidence. *Molins*, 48 F.3d at 1178-79. "Clear and convincing evidence" is evidence which gives the trier of fact "an abiding conviction that the truth of [the] factual contentions [is] 'highly probable.'" *Buildex Inc. v. Kason Indus., Inc.*, 849 F.2d 1461, 1463 (Fed. Cir. 1988) (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)). "A determination of inequitable conduct is committed to the district court's discretion." *Refac Int'l, Ltd. v. Lotus Development Corp.*, 81 F.3d 1576, 1580 (Fed. Cir. 1996). The Court will weigh the finding of materiality and intent in light of all the circumstances in determining whether inequitable conduct occurred. *Refac*, 81 F.3d at 1581. Materiality and intent are questions of fact. *GFI, Inc. v. Franklin Corp.* 265 F.3d 1268, 1273 (Fed. Cir. 2001).

There is a substantial likelihood that a reasonable examiner would have considered the information disclosed by the pre-existing patents and window operators discussed above important in deciding whether to allow the '308 patent to issue. These patents and window operators

anticipated the claimed invention. *Ashland Prods., Inc. v. Truth Hardware Corp.*, No. 99 C 5786, 2002 WL 31819027, at *11-14 (N.D. Ill. Dec. 12, 2002). Each of the aforementioned undisclosed prior art patents and window operators did not have a "mounting base with a flat planar bottom secured to a corresponding flat planar surface on a sill of the frame" contrary to the '308 patent specification claim that this feature was typical of existing window operators. Thus, these patents and window operators were material. *See Fox Indus., Inc.*, 922 F.2d at 804 ("A finding that a withheld reference anticipates a claim in a patent satisfies the most stringent standard of materiality.").

If there is no direct evidence of deceitful conduct, "[t]he intent element of [inequitable conduct must be] . . . proven by inferences from facts, with the collection of inferences permitting a confident judgment that deceit has occurred." *GFI*, 265 F.3d at 1274. However, the Court cannot presume intent only from the materiality of the withheld documents. *GFI*, 265 F.3d at 1274. Rather, "a court must weigh all the evidence, including evidence of good faith." *GFI*, 265 F.3d at 1274. "When balanced against high materiality, the showing of intent can be proportionally less." *Brasseler*, 267 F.3d at 1380-81. "[A] patentee facing a high level of materiality and clear proof that it knew or should have known of that materiality . . . can expect to find it difficult to establish 'subjective good faith' sufficient to prevent the drawing of an inference of intent to mislead." *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253, 1255 (Fed. Cir. 1997). But mere denials of intent to mislead are insufficient to prevent a determination of inequitable conduct. *GFI*, 265 F.3d at 1275.

Based on the foregoing, there was clearly an intent to mislead the PTO by the Inventors. As has been discussed, the non-disclosed prior art was highly material. It is clear that the Truth

-16-

Inventors were aware of the prior art and knew of its materiality. Truth maintained a sample drawer which contained several of the material prior art operators. Items in the sample drawer were available for examination by Truth employees. Moreover, Truth was in possession of copies of these material prior art patents at the relevant time. Assertions by the Truth Inventors that they were unaware of the relevance and importance of the prior art is not credible and is impeached and controverted by overwhelming evidence to the contrary.

It is undisputed that Johnson and Anderson did not disclose to patent counsel the prior art references or the fact that most window manufacturers left raised surfaces on windows, despite patent counsel's specific request for potentially relevant prior art. Johnson and Anderson disclosed to patent counsel only the two pieces of prior art: (1) an Arthur Shaw Operator and (2) the Roto Frank/Interlock Operator, significantly missing the plastic packer piece and installation instructions, which would disclose the "slot's" existence in the prior art. Moreover, Anderson represented to patent counsel that he had not seen and was not aware of an operator that uses a small "dam" to prevent the seepage of water into the home. This statement, based on all the relevant evidence, is patently false and misleading.

The argument that the Truth Inventors relied on patent counsel to find any material prior art is, likewise, unsupported and clearly contrary to the weight of evidence. Even if there were some evidence to support this contention, it would not overcome the fact that Truth was in possession of highly material prior art, which was not disclosed to patent counsel or the PTO. Johnson and Anderson understood what the PTO meant by the terms "prior art" and "duty to disclose"; and, yet, they consciously chose not to disclose any of the prior art cited as required by the disclosure forms or in response to direct specific requests by patent counsel despite their continuing duty to do so.

In signing the '308 patent Declaration, the Truth Inventors attested, under oath, that they understood the duty to disclose material information and had complied with that duty; by their conduct, they have violated that oath.

Thus, the Court determines, with an abiding conviction, that the undisclosed prior art was highly material and that an intent to deceive can be properly inferred from the Truth Inventors' failure to disclose it to the PTO despite their knowledge of that duty.

The evidence is clear and convincing that the Truth Inventors engaged in inequitable conduct before the PTO; and, therefore, the '308 patent is unenforceable.

_____
John W. Darrah, Judge
United States District Court

Date: July 1, 2003